IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

DEBORAH L. MCQUARY          §
                           §
VS.                        §  CIVIL ACTION NO.4:06-CV-622-Y
                           §
TARRANT COUNTY, TEXAS, ET AL §

ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Deborah L. McQuary is a former employee of the Tarrant County Sheriff's Office who has filed suit against Defendants for employment retaliation in violation of her First Amendment right to free speech and the Texas Whistleblower Act, TEX GOVT. CODE §§ 554.001, *et seq.* McQuary claims that Defendants terminated her employment because she reported numerous deficiencies in the administration and delivery of medical care to inmates in the Tarrant County jail system in violation legal and regulatory requirements.

Defendants have filed a motion (doc. #32) for partial summary judgment seeking the dismissal of all of McQuary's claims. Defendants argue that they are entitled to immunity from McQuary's constitutional claim because she cannot allege a violation of her First Amendment rights. Because the dismissal of McQuary's federal claim would leave only her state-law claim, Defendants argue that the Court should decline to exercise supplemental jurisdiction and dismiss that claim.

The sole issue raised in Defendants' motion is whether

TRM/flg

McQuary's speech is protected by the First Amendment. In making that determination, the Court is called upon to decide whether McQuary's speech was as a citizen on a matter of public concern or pursuant to her official duties. If it was pursuant to her official duties, then her speech is not protected under the First Amendment. After review, the Court concludes that McQuary's speech was part of her official duties or, at the very least, made while she was performing her official duties and made pursuant to fulfilling her official responsibilities and, thus, not protected by the First Amendment. Consequently, McQuary fails to allege a violation of her First Amendment rights and defendant Knowles is entitled to qualified immunity.[1]

I.    Factual Background

Delivery of medical care to inmates in the Tarrant County jail system involve three entities: the Sheriff's Office, the Tarrant

---

[1] Tarrant County has claimed sovereign immunity from McQuary's First Amendment claim. In its brief, Tarrant County cites to *Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397 (1997) as authority that it enjoys sovereign immunity. The word "immunity," however, appears only once in the entire opinion, and that is in the dissent. And the word "sovereign" does not appear at all. Moreover, in *Owen v. Independence,* 445 U.S. 662 (1980), a case cited by the dissent in *Brown*, the Supreme Court rejected any notion that a state or municipality could assert sovereign immunity against a claim under section 1983. "By including municipalities within the class of 'persons' subject to liability for violations of the Federal Constitution and laws, Congress—the supreme sovereign on matters of federal law—abolished whatever vestige of the State's sovereign immunity the municipality possessed." *Owen,* 445 U.S. at 648-49. Therefore, Tarrant County may not assert sovereign immunity, whether as a defense from liability or suit, against McQuary's federal claim under section 1983. Nonetheless, for reasons that will be explained later in this opinion, the Court concludes that McQuary's section 1983 claim against Tarrant County should be dismissed.

County Hospital District (also known as John Peter Smith Hospital), and University Medical Associates. John Peter Smith Hospital ("JPS") contracts with Tarrant County, through the Sheriff's Office, to provide medical care to inmates in Tarrant County jails. In turn, JPS subcontracts with University Medical Associates ("UMA"), a private entity, to provide physicians, nurses, and other medical professionals necessary for the delivery of healthcare to inmates.

Dee Anderson was elected Tarrant County sheriff in 2000 and he has continually held that office since January 2001. Over the first several years as sheriff, Anderson became increasingly aware of serious problems in the delivery of medical care to inmates. His efforts to reform the system, however, were "complicated and slowed by having to wade through the red tape of so many different entities possessing interests [that] were sometimes varied or occasionally at odds." (Defs.' App. at 1-2.) Sheriff Anderson felt especially handicapped by the fact that he lacked any medical personnel that were directly accountable to him. He complained,

> I had no one with[in] my organization with any
> medical expertise to advise me in dealing with
> these groups. It was sometimes difficult for
> me or my employees to acquire or understand
> the information we received and we were some-
> times confused by what seemed to be mixed
> signals sent from [JPS] or [UMA]. Yet I found
> myself with a constitutional duty to provide
> medical care to inmates, without necessarily
> possessing all the tools I desired to make
> sure that we were doing the right thing as a
> system and in particular cases.

3

(*Id.* at 2.)

In 2004, Sheriff Anderson convinced the Tarrant County Commissioners to hire an expert team of consultants from the American Jail Association to study the delivery of medical care to inmates and to provide recommendations. Its report documented numerous problems in the administration, delivery, and record keeping of medical care to inmates. The report made a number of recommendations, one of which included the creation of a jail medical liaison for the sheriff's office. The report envisioned the jail medical liaison

> to be the Sheriff's eyes and ears for all matters involving healthcare. The liaison's responsibilities would include representing the Sheriff in monthly healthcare meetings, answering family concerns, monitoring griev- ances, and participation in healthcare related problem solving. The medical liaison would also assist with the delivery of training for healthcare and security staff.

(*Id.* at 22.) Sheriff Anderson "wholeheartedly" embraced the recommendation and he subsequently requested that the Tarrant County commissioners fund such a position. They subsequently did.

In October 2005, the *Fort Worth Star-Telegram* published a series of exposés chronicling the healthcare problems in the Tarrant County jail system. The exposé included anecdotal stories of individual inmates and it exposed all of the healthcare problems already uncovered and documented in the American Jail Association report. Sheriff Anderson cooperated fully in the investigation

leading up to the publishing of the exposés.

After the Tarrant County commissioners created and funded the new jail medical liaison position for Sheriff Anderson, a description of the position's responsibilities was created drawing from the recommendation of the American Jail Association. According to the job description, the jail medical liaison was to "represent the Sheriff's Department in matters pertaining to the delivery of healthcare to inmates in the Tarrant County Jail System." (*Id.* at 39.) Among the "essential duties and responsibilities," the jail medical liaison operates as an intermediary between the sheriff's department and the vendors responsible for providing healthcare to the inmates and monitors of the quality and quantity of healthcare provided to inmates, conducts standardized audits of medical charts, reviews grievances, prepares the jail for inspections, and responds to healthcare inquires of inmates made by family members, attorneys, or other concerned parties. (*Id.*) According to Sheriff Anderson, "the job, at its core, involved two aspects: giving me (and my staff) insight into medical conditions at the jail through medical expertise and experience and use of that medical expertise and experience . . . to improve the healthcare system within the jail . . . ." (*Id.* at 3.)

Plaintiff Deborah McQuary is a registered nurse with more than twenty years of experience. Her experience includes providing healthcare services to patients; working with insurance carriers,

medicare, and medicaid; and ensuring that medical policies, practices, and training conform with federal and state laws and regulations.

In December 2005, the Tarrant County Sheriff's Office interviewed McQuary for the jail medical liaison position. Present in the interview were Sheriff Anderson, Chief Bob Knowles, and Dr. Alan Byrd, medical director for the jail. In the interview, McQuary was told that the position was created to provide the Sheriff with a person who possessed medical expertise and who could "with undivided loyalty" serve him and "be his watchdog to inform him about what was going on in the system and . . . to help him improve the system." (*Id.* at 85.) McQuary was informed of the American Jail Association's report and the newspaper exposés, of which she was given a copy. Sheriff Anderson states,

> I stressed to her that I expected her to talk
> to me and jail management about medical issues
> in the jail, and to represent the Sheriff's
> Office in discussing these issues with other
> entities within the system. It was clear in
> our discussions that the position for which
> she was applying would involve addressing
> individual cases as well as systematic issues.

(*Id.* at 3.)

Sheriff Anderson hired McQuary and Chief Knowles became her immediate supervisor. Nevertheless, Sheriff Anderson specifically told McQuary that "she had an 'open door' to come see me about any matter, at any time, regardless of the chain of command or Chief Knowles's status as her immediate supervisor." (*Id.*)

McQuary claims that within one week of her hire, she was "subjected to a hostile environment" that continued until her termination. (Pl.'s Compl. at 3-4.) She claims this hostility started with Dr. Alan Byrd, who, she claims, would introduce her to other employees as "the Sheriff's watch dog," and would say sarcastically, "She is here to make sure we are doing everything right." *Id.* She charges that Chief Knowles was aware of and ratified Dr. Byrd's conduct.

McQuary alleges that on December 29, 2005, she approached Chief Knowles and presented him with two letters addressed to Sheriff Anderson. The letters summarized her visits with the medical-records and registered-nurse supervisors, and concerned policies and procedures that she contended were in violation of law. She states these letters detailed violations of the Health Insurance Portability and Accountability Act and irregularities "in the jail's performance of tuberculosis testing and the related policies and protocols." (Pl.'s App. at 2.) The next day, McQuary again spoke with Chief Knowles and suggested she write a letter to Sheriff Anderson detailing her findings and recommendations for tuberculosis testing, and for standing orders and protocols governing the treatment of inmates.

McQuary alleges that Chief Knowles told her not to send the letters and admonished, "We must be careful what we write and how we write it and what goes to the Sheriff." (*Id.*) She claims that

later that day Chief Knowles came up to her, advised her that he brought her concerns to Dr. Byrd and that "Dr. Byrd was mad." (Pl.'s Compl. at 4.) And she claims that Chief Knowles refused to provide her access to the policies and procedures of JPS and to her job description. "With this introduction," McQuary alleges,

> began the repeated activity of disclosures by [her] to [Chief] Knowles of problem areas and violations of law, accompanied with recommendations and resolutions, only to be scolded by Dr. Byrd and ordered by [Chief] Knowles to ignore the violations and problem areas, not to tell the Sheriff what was going on, and to ignore her job description.

(*Id.* at 4.)

McQuary states that her reports to Chief Knowles disclosed violations of Tarrant County policies and procedures; Texas codes relating to tuberculosis screening and treatment, minimum jail standards for healthcare, and proper storage and administration of prescription medications; the Nursing Practice Act; the Texas Pharmacy Act; and the Board of Nurse Examiners Position Statements. (*Id.* at 4-5.) She avers that Chief Knowles "was deliberately indifferent" to these violations. She claims that he made "a conscious choice" not to act or investigate them, and that he prevented her from taking any corrective action or informing "anyone else, including the Sheriff" of these violations. (*Id.* at 6-7.) She alleges that she was threatened and harassed and "subjected to humiliating scrutiny" by Chief Knowles and Dr. Byrd. (*Id.* at 10.) And she claims that in response to her concern

8

regarding the inadequacy of tuberculosis testing and treatment, Chief Knowles told her he "hoped they all died from TB." (*Id.* at 8.) Despite documenting all these deficiencies while performing her job, McQuary contends, "Reporting legal and regulatory violations regarding inmate healthcare was never part of my official job duties." (Pl.'s App. at 2.) McQuary fails, however, to present any evidence of or even articulate what her official job duties did entail.

McQuary was fired in June 2006. McQuary believes that the termination of her employment "was solely in retaliation for [her] reporting violations of law" and is therefore in violation of her First Amendment rights and the Texas Whistleblower Act. (*Id.* at 11.) Chief Knowles denies ever refusing to provide McQuary with her job description or access to the policies and procedures of JPS. And he denies ever telling McQuary or implying that she should cover up or conceal any legal violations she observed. "Informing us about those kinds of things," Chief Knowles states, "were core functions of her position and I never told her otherwise." (Defs.'s App. at 43.) Chief Knowles reiterates, "I did not and never would have recommended termination or adverse action for any report that any aspect of medical care was failing to meet any legal standards; discussing such matters was part of what Ms. McQuary was hired to do." (*Id.*)

II.  Analysis

A.    Summary-Judgment Standard

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. FED. R. CIV. P. 56(c).  An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham."  *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir. 1945)). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material.  *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990).  Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party.  *Id.; Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990); *Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir. 1989).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits.  *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988).

Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5ᵗʰ Cir. 1992).  Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5ᵗʰ Cir. 1994).  Further, the Court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 249.

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).  A defendant moving for summary judgment may submit evidence that negates a material element of the plaintiff's claim or show that there is no evidence to support an essential element of the plaintiff's claim.  *See Celotex Corp.*, 477 U.S. at 322-24; *Crescent Towing and Salvage Co. v. M/V Anax*, 40 F.3d 741, 744 (5ᵗʰ Cir. 1994); *Lavespere*, 910 F.2d at 178.

To negate a material element of the plaintiff's claim, the defendant must negate an element that would affect the outcome of the action.  *See Anderson*, 477 U.S. at 247.  If the defendant moves for summary judgment alleging no evidence to support an essential

element of the plaintiff's claim, the defendant need not produce evidence showing the absence of a genuine issue of fact on that essential element. Rather, the defendant need only show that the plaintiff, who bears the burden of proof, has adduced no evidence to support an essential element of his case. *See Celotex*, 477 U.S. at 325; *Teply v. Mobil Oil Corp.*, 859 F.2d 375, 379 (5th Cir. 1988).

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing *Celotex*, 477 U.S. at 324); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50.


B.   Discussion

The crux of McQuary's complaint is that Defendants violated her First Amendment right to free speech when they terminated her employment as the jail medical liaison because she attempted to report violations of law and regulation in the administering of healthcare to Tarrant County prison inmates. Defendants argue that

reporting such violations was a part of McQuary's official duties and, therefore, not protected by the First Amendment.

Section 1983 provides for a cause of action against individuals or entities acting under color of state law who have deprived a person of any right, privilege, or immunities secured by the Constitution and laws of the United States. *See* 42 U.S.C. § 1983; *McClendon v. City of Columbia,* 305 F.3d 314, 322 (5th Cir. 2002)(en banc). To the extent a plaintiff seeks money damages directly from public officials for actions taken under color of state law, the officials may invoke their right to qualified immunity. *See Hafer v. Melo*, 502 U.S. 21, 26 (1991). Public officials' performing discretionary functions enjoy immunity from suits for damages, provided their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

> To determine whether an official is entitled to qualified immunity, the Court asks (1) whether the plaintiff has alleged a violation of a constitutional right, and (2) whether the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident.

Connelly v. Tex. Dep't of Crim. Justice, 484 F.3d 343, 346 (5th Cir. 2007). The threshold question in this case is when McQuary reported the alleged legal and regulatory violations in the delivery of medical care to Tarrant County prison inmates, was she

speaking "as a citizen" on a topic of public concern or as part of her official public job?  If her speech was pursuant to her official duties, then it is not protected under the First Amendment and Chief Knowles is entitled to qualified immunity.

The Supreme Court has made clear that public employees are not divested of all of their First Amendment rights by virtue of their employment.  *See Garcetti v. Ceballos,* 126 S.Ct. 1951, 1957 (2006).  "Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen on matters of public concern."  *Williams v. Dallas Independent School District,* 480 F.3d 689, 691 (5th Cir. 2007).  But when "a citizen enters government service, the citizen must accept certain limitations on his or her freedom."  *Garcetti,* 126 S.Ct. at 1958.  The prospect of First Amendment protection does not invest public employees "with a right to perform their jobs however they see fit."  *Id.* at 1960.

> To establish a [section] 1983 claim for employment retaliation related to speech, a plaintiff-employee must show: (1) he suffered an adverse employment action, . . . (2) he spoke as a citizen on a matter of public concern, . . . (3) his interest in the speech outweighs the government's interest in the efficient provision of public services, . . . and (4) the speech precipitated the adverse employment action.

*Nixon v. City of Houston,* 511 F.3d 494, 497 (5th Cir. 2007).  The first inquiry is "whether the employee spoke as a citizen on a matter of public concern . . . . If the answer is no, [then] the employee has no First Amendment cause of action based on . . . her

14

employer's reaction to the speech." Garcetti, 126 S.Ct. at 1958.
"Even if the speech is of great importance, it is not protected by
the First Amendment so long as it was made pursuant to the worker's
official duties." *Williams,* 480 F.3d at 692, citing *Garcetti,* 126
S.Ct. at 1960. Thus, under *Garcetti*, the focus is on the role
McQuary occupied when she spoke out regarding the alleged viola-
tions of law and regulation she witnessed in the administration of
healthcare to Tarrant County prison inmates.

> This consideration reflects the importance of
> the relationship between the speaker's expres-
> sions and employment. A government entity has
> broader discretion to restrict speech when it
> acts in its role as employer, but the restric-
> tions it imposes must be directed at speech
> that has some potential to affect the entity's
> operations.

*Id.* at 1958.

The Supreme Court did not elaborate on what it means to speak
pursuant to one's official duties; however, the high court has
rejected the notion that a formal job description is dispositive of
the question of what duties an employee is expected to perform.

> We reject, however, the suggestion that em-
> ployers can restrict employee's rights by
> creating excessively broad job descriptions. .
> . . The proper inquiry is a practical one.
> Formal job descriptions often bear little
> resemblance to the duties an employee actually
> is expected to perform, and the listing of a
> given task in an employee's written job de-
> scription is neither necessary nor sufficient
> to demonstrate that conducting the task is
> within the scope of the employee's profes-
> sional duties for First Amendment purposes.

15

*Id.* at 1961-62. Neither is it dispositive that the speech relates tangentially to the subject matter of one's employment. *Id.* at 1959. *Garcetti* did list making a public statement, discussing politics with a coworker, and writing a letter to newspapers or legislators as examples of prototypical speech protected by the First Amendment. *Id.* at 1960-61.

On only a few occasions has the United States Court of Appeals for the Fifth Circuit elaborated on what speech may be considered as part of a public employee's official duties since the Supreme Court handed down *Garcetti*. In those cases, the Fifth Circuit distinguished "between speech that is the kind of activity engaged in by citizens who do not work for the government and activities undertaken in the course of performing one's job." *Williams,* 480 F.3d at 693. "Activities undertaken in the course of performing one's job are activities pursuant to official duties and not entitled to First Amendment protection." *Davis v. McKinney,* No. 07-20184, 2008 U.S. App. LEXIS 3705 *18 (5th Cir. Feb. 21, 2008), citing *Williams,* 480 F.3d at 693. Even if the public employee was not required to make the speech as part of his official duties, if the speech was made during the course of performing one's job or for the purposes of fulfilling one's job responsibilities, it is not protected by the First Amendment. *See Williams,* 480 F.3d at 694 (high school athletic director who wrote memo inquiring as to athletic-department funds not protected by First Amendment because

even though his official duties did not include writing the memo, it was made in the course of performing the job and knowledge of funds was necessary for the athletic director to perform his job).

The Fifth Circuit has recognized that "when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." *Davis,* 2008 U.S. App. LEXIS at *19. On the other hand, if a public employee "takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen." *Id.; Cf. Charles v. Grief,* No. 07-50537, 2008 U.S. App. LEXIS 6275, *15 (5th Cir. Mar. 26, 2008)(holding speech communicated "externally" to Texas legislators protected by First Amendment). The Fifth Circuit further recognized that "the caselaw is unanimous in holding that employee's communications that relate to his own job function up the chain of command, at least within his own department or division, fall within his official duties and are not entitled to First Amendment protection." *Davis,* 2008 U.S. App. LEXIS at *20, n.3.

Whether McQuary spoke as a citizen on a matter of public concern or pursuant to her official duties is a question of law for the Court to decide. *See Williams,* 480 F.3d at 692-94; *see also Charles*, 2008 U.S. App. LEXIS 6275 at *11, n.17 ("On further

reflection, we acknowledge that, even though analyzing whether *Garcetti* applies involves the consideration of factual circumstances surrounding the speech at issue, the question whether Charles's speech is entitled to protection is a legal conclusion properly decided at summary judgment.")

Applying the above, the Court concludes that McQuary's reports to Chief Knowles of illegalities and irregularities in the provision of medical care to prison inmates is not protected by the First Amendment. It is undisputed that the jail medical liaison position was created in the aftermath of revelations that prison inmates in Tarrant County jails were not receiving the level of healthcare mandated under the law. The purpose of the position was to provide Sheriff Anderson with an individual who had "undivided loyalty" to him and possessed the necessary medical expertise and experience to identify deficiencies and present solutions. Both Sheriff Anderson and Chief Knowles have stressed that a pivotal role of the jail medical liaison was to be the "eyes and ears" of the sheriff's office, and to inform them when the delivery of healthcare, whether systematic or in a particular case, was not in accordance with required standards. The jail medical liaison was also to assist the sheriff's office in correcting any deficiencies and proposing policies and procedures that would ensure that prison inmates received the quality and quantity of healthcare required by law.

McQuary disputes that her official duties included her reporting any illegalities and irregularities in the delivery of healthcare to prison inmates. But she never articulates, either in her complaint or in her Rule 7(a) reply, what her official duties did entail. Still, to support her position that her official duties did not include reporting legal violations, McQuary states that she was told to ignore legal and regulatory violations, she was refused access to the policies and procedures of JPS, she was refused access to her job description, she was told to ignore her job description, and she was told not to report legal and regulatory violations. Even if true, however, it is still undisputed that her job required her to monitor the quality and quantity of healthcare provided to prison inmates, to audit medical charts, to review grievances, to respond to inquiries regarding an inmate's healthcare, and to prepare the jail system for inspections. - McQuary witnessed the violations and made her reports while she was performing those official duties. And the violations she witnessed and reported were directly related to those duties because they directly impacted the quality and quantity of healthcare she was charged with monitoring, they directly affected her review of grievances, they played a direct role in her responding to inquiries into a prison inmate's health and the care he was receiving, and they directly affected her ability to prepare the jail for its inspections. Thus, even if McQuary was not required

to report these violations, which the Court finds hard to believe, it is clear that she did so pursuant to her official duties and in the course of performing and fulfilling her responsibilities. *Compare Williams,* 480 F.3d at 694 ("Simply because Williams wrote memoranda, which were not demanded of him, does not mean he was not acting within the course of performing his job. He needed account information so that he could properly execute his duties as athletic director, namely, taking the students to tournaments and paying their entry fees.") *with Charles,* 2008 U.S. App. LEXIS 6275 at *13-14 ("Most significantly, though, Charles's speech . . . was not made in the course of performing or fulfilling his job responsibilities, was not even indirectly related to his job, and was not made to higher-ups in his organization . . . but was communicated directly to elected representatives of the people.").

Moreover, McQuary's reports were made internally, to her immediate supervisor, and not externally such as to any elected representative or media organization. Her decision to follow and use her chain of command in identifying and reporting deficiencies is a significant factor in determining that her speech is not protected by the First Amendment because it further illustrates that she was speaking as the jail medical liaison and not as a private citizen. *Compare Charles,* 2008 U.S. App. LEXIS 6275 at *14-15 ("Charles voiced his complaints *externally*, to Texas

legislators who had oversight authority over the Commission, not *internally,* to supervisors. His decision to ignore the normal chain of command in identifying problems with Commission operations is a significant distinction.")(Emphasis in original) *with Williams,* 480 F.3d at 694, n.2 ("This is not a case where Williams wrote to the local newspaper or school board with his athletic funding concerns*.").*

C. Tarrant County

As mentioned above, Tarrant County does not enjoy sovereign immunity from McQuary's First Amendment claim. Nevertheless, "A municipality generally is immune from constitutional tort liability unless such liability arises out of the execution of an official policy or custom of the municipality." *Allison v. Tarrant County,* 92 F. Supp. 2d 601, 603 (N.D.Tex. )(Means, J.). To put it another way, before a municipality will be susceptible to liability for a constitutional tort, a plaintiff must establish that a constitutional deprivation occurred and prove that a policy, practice, or custom of the municipality was the moving force behind the plaintiff's suffering that constitutional deprivation. *See Delano-Pyle v. Victoria County,* 302 F.3d 567, 574 (5th Cir. 2002)("Municipal liability under [section] 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or

custom."). "A single action by a municipal officer possessing final policymaking authority regarding the action in question constitutes official policy of the municipality . . . ." *Allison,* 92 F. Supp. 2d at 603; *see also Cozzo v. Tangipahoa Parish Council-President Gov't,* 279 F.3d 273, 289 (5th Cir. 2002)("[A] final decisionmaker's adoption of a course of action [even if tailored to a particular circumstance and not intended to control in other situations] may, in some circumstances, give rise to municipal liability under [section] 1983.").

McQuary has alleged that the actions and conduct of Chief Knowles violated her First Amendment rights. His actions and conduct form the basis of McQuary's complaint against Chief Knowles in his individual capacity. But that same conduct also forms the basis for her complaint against Tarrant County. According to her complaint:

> For purposes of this section 1983 claim, defendant Knowles, in his official capacity, represents and is a policymaker of Tarrant County, Texas, responsible for the promulgation of the official policy, rules, practices, and procedures for the Tarrant County Confinement Bureau regarding assignment and discipline. The actions of Defendant Knowles herein represent official policy of Tarrant County, Texas, which policy has denied the plaintiff her constitutional rights to free speech under the laws of the First Amendment . . . making Tarrant County, Texas, and Knowles in his official capacity responsible for . . . damages and injuries . . . .

(Pl.'s Compl. at 5.) Thus it is clear that McQuary's theory of

Tarrant County's liability rests, fatally, on the actions and conduct of Chief Knowles.

As discussed thoroughly above, Chief Knowles is entitled to qualified immunity because McQuary has failed to allege a violation of her First Amendment rights. This is because her speech was part of her official duties or, at the very least, was made in the course of performing her official duties and pursuant to fulfilling her official responsibilities. Thus, even if Chief Knowles "is a policymaker of Tarrant County, Texas, responsible for the promulgation of the official policy, rules, practices, and procedures for the Tarrant County . . . regarding assignment and discipline," and even assuming Chief Knowles possessed final policymaking authority such that his conduct would constitute official policy of Tarrant County, with no underlying constitutional violation committed by him, Tarrant County cannot be held liable for having an official policy, practice, or custom that was the moving force behind the violation of McQuary's First Amendment rights. With no constitutional deprivation to link to an official policy, there can be no municipal liability. Therefore, Tarrant County is entitled to summary judgment in its favor on McQuary's First Amendment claim because Chief Knowles's conduct did not violate McQuary's First Amendment rights.

D.    McQuary's State-Law Claim

McQuary's complaint contains two claims, one pursuant to section 1983 for a violation of First Amendment rights and the second under the Texas Whistleblower Act, TEX GOVT. CODE §§ 554.001, *et seq.* The Court enjoys supplemental jurisdiction over McQuary's state-law claim because that claim is "so related" to her federal claim. *See* 28 U.S.C. § 1367(a). Section 1367, however, permits a district court to decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction . . . ."  28 U.S.C. § 1367(c)(3).

The Fifth Circuit has stated that the "general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed." *Parker & Parsley Petroleum Co. v. Dresser Industries,* 972 F.2d 580, 585 (5th Cir. 1992). Indeed, the Fifth Circuit has noted that when a district court has eliminated the federal claims at an early stage in the litigation, "the district court has a powerful reason to choose not to continue to exercise jurisdiction." *Id.* Therefore, having concluded that Tarrant County and Chief Knowles are entitled to summary judgment in their favor over McQuary's First Amendment claim, the Court concludes that it should decline to exercise supplemental jurisdiction over her remaining state-law claim.

III. Conclusion

For the reasons stated above, the Court GRANTS Defendants' motion for partial summary judgment. The Court concludes that Tarrant County and Chief Knowles are entitled to summary judgment in their favor on McQuary's First Amendment claim because her speech was part of her official duties or, at the very least, was made while she was performing her official duties and made pursuant to her fulfilling her official responsibilities and, therefore, not protected by the First Amendment. McQuary's claim under section 1983 is dismissed with prejudice. Leaving only her claim under the Texas Whistleblower Act, the Court declines to exercise supplemental jurisdiction and dismisses that claim without prejudice.

SIGNED March 31, 2008.

Terry R. Means
_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE